# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| MORSEY CONSTRUCTORS LLC, | ) |
| --- | --- |
| Plaintiff, | ) |
| v. | ) Case No. 3:18-00758 |
| JMN REBAR LLC, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

This lawsuit arose after JMN Rebar LLC walked off the job at the Chemours Air Separation Plant in New Johnsonville, Tennessee on August 1, 2017. Morsey Constructors LLC, which had contracted with Air Products & Chemicals Inc. to construct the foundation of the plant and subcontracted JMN to perform a portion of that work, sued JMN for breach of contract. It has now filed a Motion for Summary Judgment (Doc. No. 25) on that claim in the amount of $287,991.69, plus attorney's fees. Because the motion raises more questions than it provides answers, summary judgment will be denied.

## I.

In support of its summary judgment motion, and in accordance with this Court's local rules, Morsey submitted a statement of undisputed fact. Those facts are based largely upon the declaration of Eric McLean. JMN disputes all but one of those 23 paragraphs of facts because "the declaration of Eric McLean was verified upon 'the best of his knowledge and belief.'" (Doc. No. 335-1, *passim*). This approach was risky because it presumed – incorrectly as it turns out – that the Court would agree with JMN's position that McLean's declaration is "incompetent to establish any fact

1

on summary judgment." (Id.).

Even though McLean indicated that the statements in his declaration were to the "best of his knowledge and belief," this was prefaced with his averment that he was "personally familiar with the facts and statements made below[.]" (Doc. No. 25-1 at 1). Moreover, McLean's declaration is largely devoted to authenticating email communications and correspondence between the parties, and JMN does not claim that the documents McLean references are inauthentic. Nor does JMN assert, as required by Rule 56(c), "that the material cited to support . . . a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Perhaps this is because "an email can qualify as an admissible record of a regularly conducted business activity as long as the proponent satisfies the requirements of Rule 803(6)," United States v. Daneshvar, 925 F.3d 766, 777 (6th Cir. 2019), or the proponent can simply call the author of the email to authenticate it. Beyond identifying the emails, the statements made in McLean's declaration appear to be based on his personal knowledge as Morsey's Director of Projects.[1]

As a consequence, the statements made by McLean stand virtually undisputed. Fortunately for JMN, however, those facts, in conjunction with the other facts marshaled by Morsey, do not warrant the entry of summary judgment.

## II.

In an email dated July 25, 2017, Mitch Jacobs at Morsey invited Richard Wallace at JMN,

---

[1] JMN's reliance on this Court's recent opinion in Clark v. Clarksville Hous. Auth., No. 3:18-CV-00678, 2020 WL 134114, at * 3 (M.D. Tenn. Jan. 10, 2020) is entirely misplaced. There, the Court rejected a declaration from the director of a housing authority about when a decision was made because she did not even work for the housing authority at the time, nor did she "claim to have looked at the minutes or other records to see what transpired at the meeting. All she did is 'verify' what counsel wrote in the affidavit[.]" Id. at 3. JMN's perceived deficiencies in McLean's declaration hardly rise to that level.

to submit a quote for the installation of rebar in the foundation of Chemours' new air separation plant. Attached to the email was a copy of the Construction Specification 600.002, Project Scope of Work for Civil and Underground Construction. The Specification provided that "at least two (2) weeks prior to mobilization, the Contractor shall submit for every person entering the site a letter confirming" that background checks and negative drug and alcohol test had been secured for each prospective employee.

The following two days resulted in the exchange of a flurry of emails between the parties. On July 26, 2017, Roger Struble, JMN's Vice President of Operations, sent Jacobs a "Proposal Contract" that quoted a price for installation of rebar at the rate of $415.66 per ton. Specifically excluded from that figure was the cost of "moving or double-handling of reinforcing steel and materials from lay-down yard or area." (Doc. No. 25-4 at 4). The "Proposal Contract" also contained the following provision:

> If accepted, the terms and conditions of this Subcontract Proposal, as mutually agreed upon, shall be incorporated into any final contract if one is provided to Subcontractor. Otherwise, Contractor's notice to proceed, whether by mail, phone, facsimile, or by any other means of communication shall constitute an acceptance of this offer and shall bind the Contractor to the terms and conditions as set forth herein, and not other writing shall be required by Subcontractor.

(Id.).

Later that same day, Jacobs emailed Struble and attached the following documents that needed to be completed before mobilization: (1) Authorization to Release Criminal Information as a Condition to Access Site form; (2) Applicant's Disclosure & Authorization for Background Screening form; (3) Informed Consent for Drug/Alcohol Testing form; and (4) Disclosure and Authorization form for obtaining a consumer report. JMN was also informed by phone conversation

3

and a separate email that it needed to provide an EMR (Experience Rating Modification History) letter as a prerequisite to being accepted as a qualified subcontractor on the project, and that it should provide a time and material ("T&M") rate, as well as a quote for installation of wire mesh. (Doc. No. 25-6 at 12).

In response, JMN provided Morsey a T&M rate of $59 per hour and a price for installation of wire mesh of .15 per square foot. (Doc. No. 25-8 at 2). JMN, through Struble by a separate email, also informed Morsey that it "would need a price of $450 a ton" for the rebar because of the background checks. (Doc. No. 25-9 at 2). This was confirmed in a revised "Proposal Contract" that indicated the cost for rebar installation would be $449.96 per ton. That "Proposal Contract" contained the same language as before regarding the movement of rebar and acceptance of the terms and conditions. (Doc. No. 25-10 at 5). In a response email, Jacobs wrote Struble: "Approved, will get you a subcontract tomorrow." (Doc. No. 25-11 at 2).

On July 27, 2017, Greg Byant, a representative of Air Products informed Morsey that JMN was approved as a subcontractor for the project. In turn, Jacobs wrote Struble that (1) "Angel [Little] is writing up a subcontract as we speak"; (2) "[t]his is your notice to proceed on this job"; and (3) "[p]lease begin to send background authorization paperwork ASAP so we can get you all on site ASAP." (Id.). A half-hour later, Little emailed Morsey's Contractor's Subcontract No. 174281-06 ("Subcontract") to Struble.

Jean Nachreiner, the owner of JMN, signed the Subcontract on July 27, 2017. She also provided Morsey a Certificate of Liability Insurance dated July 27, 2017, naming Morsey as the certificate holder and identifying Morsey as an additional insured for the Project. That same day and the next, JMN began submitting authorization forms for the employee drug/alcohol screens.

4

On August 1, 2017, JMN workers mobilized at the construction site and attended an orientation required by Air Products. They then began working. However, a few hours later, JMN workers were pulled of the work site. Nachreiner, by letter, explained that JMN had "decided to pass on the Air Products & Chemicals Inc. Project" because "[t]here were a number of project conditions" of which JMN was not aware, including (1) "many obstacles with background checks and security requirements"; (2) "the requirement to have a respirator attached to the waist [that] prevented our employees from wearing their tool belts"; (3) "the rebar was not stored in a systematic format to identify which rebar was to be used where"; and (4) "our quote excluded our employees from double handling or moving rebar from the lay down yard," but they were told on site that they would have to move the rebar, as well as provide "flagging equipment operators." (Doc. No. 25-18 at 1).

Once JMN exited the site, it fell to Morsey to perform the rebar work. As a result, Morsey claims that it "incurred damages of $287,991.69." This figure is based upon difference between what it actually cost Morsey for the rebar work – $479,915.29, and what it would have cost JMN to complete the work – $191,923.60 (based on installing 410 tons of rebar at $449.96 per ton and 49,600 square feet of wire mesh at .15 per square foot). Morsey also claims that it is entitled to its attorney fees under the plain terms of the Subcontract.

**III.**

"Summary judgment is proper if the evidence shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." City of Wyandotte v. Consol. Rail Corp., 262 F.3d 581, 585 (6th Cir. 2001) (citing, Davis v. Sodexho, Cumberland Coll. Cafeteria, 157 F.3d 460, 462 (6th Cir. 1998)). In determining whether the moving party is entitled to judgment, "all facts and inferences drawn therefrom" are "consider[ed] . . . in the light most

5

favorable to the nonmovant." Id.

"[U]nder Tennessee law, which governs this case, contract interpretation is a question of law," Ray Bell Constr. Co. v. Tenn., 356 S.W.3d 384, 386 (Tenn. 2011), and very often "the appropriate procedural device" for resolving "matters of contract interpretation" is summary judgment, Highland Mining Co. v. United Mine Workers of Am., Dist. 12, 105 F. App'x 728, 730 (6th Cir. 2004). See also Estate of Brown, 402 S.W.3d 193, 197 (Tenn. 2013) ("Summary judgments are appropriate in virtually any civil case that can be resolved solely on issues of law.'). This is because "[t]he literal meaning of the contract language controls if the language is clear and unambiguous." Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc., 395 S.W.3d 653, 659 (Tenn. 2013); see also Franklin Am. Mortg. Co. v. Univ. Nat'l Bank of Lawrence, 910 F.3d 270, 282 (6th Cir. 2018) (observing that where the contract language is clear and unambiguous, the literal meaning controls the outcome of the dispute because it is the best indicator of the parties' intent under Tennessee law).

"[I]n reviewing a contract for ambiguities, the court considers the contract as a whole." Baptist Physician Hosp. Org., Inc. v. Humana Military Healthcare Servs., Inc., 368 F.3d 894, 897–98 (6th Cir. 2004) (citing Williamson County Broad. Co. v. Intermedia Partners, 987 S.W.2d 550, 552 (Tenn. Ct. App. 1998)). "'A contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one. A strained construction may not be placed on the language used to find ambiguity where none exists.'" Id. (quoting Farmers–Peoples Bank v. Clemmer, 519 S.W.2d 801, 805 (Tenn. 1975)). Nor is a contract "'rendered ambiguous simply because the parties disagree as to the interpretation of one or more of its provisions.'" Id. at 898 (quoting, International Flight Ctr. v. City of Murfreesboro, 45 S.W.3d 565, 570 n. 5 (Tenn. Ct. App.

6

2000)).

**IV.**

To prevail on its breach of contract claim, Morsey is required to show the existence of an enforceable contract, nonperformance amounting to the breach, and damages caused by the breach. Life Care Cntrs. of Am. Inc. v. Charles Town Assoc's. Ltd. Partnership, LPIMC, Inc., 79 F.3d 496, 514 (6th Cir. 1996); ARC LifeMed, Inc. v. AMC-Tennessee, Inc., 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005). Morsey claims to have established those elements because, just days before work was to begin, Nachreiner signed Subcontract No. 174281-06, which called for the installation of rebar at the rate of $449.96 per ton, wire mesh at the rate of 15¢ a square foot, and provided for "any loss or damages" including attorney's fees "by reason of Subcontractors failure to perform its work in accordance with the terms of this Subcontract." (Doc. No. 32-1 at 23). She also provided proof of general liability insurance as required by that Subcontract. This position, of course, fails to acknowledge that the Subcontract was not the first writing between the parties about rebar installation at the air separation plain.

Unlike Morsey, this Court cannot simply ignore the course of dealing between the parties. "The common thread in all Tennessee contract cases – the cardinal rule upon which all other rules hinge – is that courts must interpret contracts so as to ascertain and give effect to the intent of the contracting parties consistent with legal principles." Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc., 566 S.W.3d 671, 688 (Tenn. 2019) (citing Wallis v. Brainerd Baptist Church, 509 S.W.3d 886, 899 (Tenn. 2016); Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc., 395 S.W.3d 653, 659 (Tenn. 2013)). "Also foundational to [Tennessee] jurisprudence is the principle that the rules used for contract interpretation 'have for their sole object to do justice

between the parties, by enforcing a performance of their agreement according to the sense in which they mutually understood it at the time it was made.'" Id. (quoting McNairy v. Thompson, 33 Tenn. 141, 149 (1853)). As the Tennessee Supreme Court further explained:

> Looking at the broad range of Tennessee contracts cases, it is clear that Tennessee courts have sought, albeit imperfectly, to achieve balance in contract interpretation. The central principle endures, to interpret contracts so as to ascertain and give effect to the intent of the contracting parties. In effectuating this principle, our courts have noted that judges "are entitled to place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them, and so as to judge of the meaning of the words and of the correct application of the language to the things described." Courts should not be "shut out from the same light which the parties enjoyed when the contract was executed."
>
> However, the strong strain of textualism in Tennessee caselaw demonstrates resolve to keep the written words as the lodestar of contract interpretation. Tennessee has rejected firmly any notion that courts are a fallback mechanism for parties to use to "make a new contract" if their written contract purportedly fails to serve their "true" intentions. Tennessee courts "give primacy to the contract terms, because the words are the most reliable indicator—and the best evidence—of the parties' agreement when relations were harmonious, and where the parties were not jockeying for advantage in a contract dispute."

Id. at 694 (internal citations omitted). In short, Tennessee cases "reflect balance; they demonstrate a definite focus on the written words in the parties' contract, but they also consider evidence related to the situation of the parties and the circumstances of the transaction in interpreting those words." Id. at 692.

Here, the Subcontract quickly followed the two Proposal Contracts from JMN, the second of which was the same as the first, but increased the rate of rebar per ton and the per foot wire mesh rate. Both Proposal Contracts specifically excluded the cost of "moving or double-handling of reinforcing steel and materials from lay-down yard or area," and both provided that they could be accepted by Morsey providing a "notice to proceed," which it did via Jacobs' emails to Struble. This

suggests an agreement was reached between the parties on the essential terms, *i.e.*, a contract.

In making this observation, the Court recognizes that the last Proposal Contract from JMN preceded Morsey's Subcontract, and that Subcontract contained a merger or integration clause. Specifically, the Subcontract provided:

> **T. Entire Agreement**. The whole and entire agreement of the Parties with respect to the subject matter hereto, is set forth in this Contract; and the Parties are not bound by any prior agreement, understandings or conditions other than as expressly set forth herein. This contract is limited to the terms and conditions specified herein, on the face of the Prime contract and in any attachment thereto provided by the corporation or specifically agreed to by the corporation in writing. The corporation does not agree to any proposed addition, alteration or deletion of these terms. . . .

(Doc. No. 25-16 at 8).

It is true, as Morsey points out, that merger clauses indicate "the parties' intent that the contracts embody their complete and exclusive agreement," Individual Healthcare, 566 S.W.3d at 697, and that "[a] completely integrated agreement must be interpreted on its face [because] the purpose and effect of including a merger clause is to preclude the subsequent introduction of evidence of preliminary negotiations or of side agreements in a proceeding in which a court interprets the document," Sec. Watch, Inc. v. Sentinel Sys., Inc., 176 F.3d 369, 372 (6th Cir. 1999). (Doc. No. 37 at 2-3). But this argument presupposes that the agreement was, in fact, completely integrated, something that is seemingly belied by the following provision in the Subcontract:

9

| Item | Contract Item | Description | Quantity | UM | Unit Price | Extended Price |
|---|---|---|---|---|---|---|
| 1 | 1 | Air Products – Civil and Underground Project - Rebar | N/A | TON | $449.96 | |
| 2 | 2 | Air Products – Civil and Underground Project – Wire Mesh | N/A | SQFT | $0.15 | |
| | | Contractor to complete pages 18-21 of this contract prior to mobilization (7/31/17) which allows Morsey to run background checks in order to allow employees on site. Provide all supervision, labor, equipment, material, tools, etc. to perform the scope of work for the Air Products – Civil and Underground Project in New Johnsonville, TN per your proposal dated 7/26/17. | | | | |

(Doc. No. 25-16 at 2). Does the "perform the scope of the work . . . per your proposal dated 7/26/17" also exclude the cost of "moving or double-handling of reinforcing steel and materials from lay-down yard or area," as the Proposal Contracts did? Do rodbusters expect the rebar to be already sorted and on site? If not, was the T&M rate designed to cover the additional movement of material? If it was, should the rate be $59 per hour as now suggested by Morsey, even though the Subcontract did not expressly mention that rate but the Struble's email on July 26, 2017 at 3:52 pm did? What about respirators? Were they even required as Nachreiner suggests, or were they not, as McLean conclusorily asserts?

Unanswered question also exist as to Morsey's damages figure. That figure is supported by spreadsheets, but there is no indication as to whether the costs Morsey incurred were reasonable. Nor does Morsey's figure account for the JMN's projected cost in moving and handling the rebar, which it pegs at an additional $106,200.00. More than that, was it even necessary for Morsey to assume the rebar work given that West Wind Reinforcing LLC had submitted a bid on June 5, 2017 in the amount of $485 per ton for installation of the rebar, and 17¢ a square foot for wire mesh? (Doc. No. 34-1 at 2). Was a West Wind crew still available just weeks later? Did Morsey make an

10

inquiry as to their or other local ironworker's availability? While "an injured party is not required to make extraordinary efforts . . . "[i]t is a well established rule in Tennessee that the party injured by the wrongful act of another has a legal duty to exercise reasonable and ordinary care under these circumstances to prevent and diminish the damages." Carolyn B. Beasley Cotton Co. v. Ralph, 59 S.W.3d 110, 115 (Tenn. Ct. App. 2000). Whether Morsey made an effort and whether that effort was reasonable are but additional questions unanswered by the summary judgment record.

## IV.

Because unanswered questions abound, Morsey's Motion for Summary Judgment (Doc. No. 25) will be denied. Nothing the Court has said, however, should be read as suggesting that JMN could walk away from the New Johnsonville jobsite scot-free. To the contrary, JMN unquestionably agreed to install the rebar at the Chemours' plant, and whether performance was somehow excused is not an issue before the Court. Maybe Morsey was "completely blindsided" when JMN walked off the job as McLean wrote in an email to Air Products on the afternoon of August 1, 2017 (Doc. No. 25-17 at 2), or maybe JMN was hoodwinked into accepting the rebar job in the first place. Either way, that is something only a jury can decide if the parties are unable to settle this case.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE